IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STEVEN E. LANDIS,
    Plaintiff,

v.

DAVID PHALEN, FAIRFIELD
COUNTY SHERIFF, et al.,
    Defendants.

Case No. 2:05-CV-649
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Norah McCann King

## OPINION AND ORDER

This matter is before the Court for consideration of the Defendants' Motion for Summary Judgment. (Doc. #44). For the reasons that follow, the motion is granted in part and denied in part.

### I.

Plaintiff, Steven E. Landis ["Plaintiff"], brings this action against the Sheriff of Fairfield County, Ohio, David Phalen, and Sheriff's Deputies Daniel Allen, Greg Storts, and Marian DeVault, claiming violations of Plaintiff's constitutional rights in connection with his arrest. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

This action arises out of events which occurred on July 17, 2004. At the time, Plaintiff's wife owned a state-licensed adult care facility for mentally ill patients at 314 Bartlett Street, Bremen (Fairfield County), Ohio. (*Pl. Depo.* at 21-25). Plaintiff worked as the primary care-taker at the residence. (*Id.* at 24). The Defendants were dispatched to the residence on July 17, 2004 on an alleged domestic dispute call. Deputy Storts testified that when he arrived at the

residence, he found Plaintiff's son, Steven M. Landis, outside[1]. The son told Deputy Storts that he and Plaintiff had been drinking rum, they got into an argument, and that Plaintiff would not let the son leave[2]. (*Storts Depo.* at 66). The son also told Deputy Storts that the Plaintiff let the air out of his car tire and that the Plaintiff had his clothes and birth certificate. (*Id.* at 67-68). Shortly after the Deputies arrived, Plaintiff came outside and Deputy Storts told Plaintiff that, if the son was not drunk, he could leave, since the son was an adult. (*Id.* at 70). Deputy Allen performed a horizontal gaze nystagmus test on the son. (*Allen Depo.* at 32). Plaintiff's wife, Norma, arrived at the residence sometime after the Deputies arrived. (*Norma Landis Depo.* at 58-59). Deputy Allen testified that Plaintiff was "very agitated" but did gather the son's clothes for him to leave. (*Allen Depo.* at 49). According to Deputy Allen, Plaintiff admitted he was drinking. Plaintiff used profanity and yelled at the Defendants, telling them they should not be there. (*Id.* at 50). The son was ultimately cleared to leave the residence. Storts testified that prior to leaving the residence, the son told the Deputies that the Plaintiff had drugs and guns in the house. (*Id.* at 80).

After the son left the residence, the Deputies were outside talking to Norma Landis as to whether it was appropriate to have Plaintiff in the presence of the patients in the house. Plaintiff, who was inside the house, kept coming outside "yelling and screaming" for the

---

[1]The son had been staying at the residence for approximately two weeks. (*Pl. Depo.* at 27).

[2]By way of background, Plaintiff's son arrived at Plaintiff's home on July 17, 2004 after having an argument with his girlfriend. The son brought a bottle of Bacardi 151 rum to the house. Plaintiff and his son drank the rum and, after several hours, the son decided to call his girlfriend in Ashville, Ohio. (*Steven M. Landis Depo.* at 22-26). The son apparently became aware that another man was with his girlfriend and told the Plaintiff he wanted to go to Ashville to confront the couple. (*Pl. Depo.* at 46-47). Plaintiff did not want the son to go and Plaintiff telephoned his wife, Norma, to ask her to intervene. (*Norma Landis Depo.* at 55). The son went to a neighbor's house, created a disturbance, and the neighbor called the police. (*Steven M. Landis Depo.* at 30).

Deputies to get off of his property. (*Allen Depo.* at 65). He also told his wife not to talk to the Deputies[3]. Deputy Storts told Plaintiff to remain inside the house or he would be arrested. When Plaintiff kept coming outside, Storts told him he was under arrest[4]. (*Storts Depo.* at 111).

Storts testified that Plaintiff started to put his hands behind his back and when Storts reached for his hands, Plaintiff turned his body quickly, causing Storts to shove Plaintiff forward to the side of the house. (*Id.* at 127-28). As Storts struggled with Plaintiff, he called Deputy Allen to come up to the porch to assist. (*Allen Depo.* at 66). Deputy Storts then walked Plaintiff to Deputy Allen's cruiser. Deputy Storts directed Plaintiff to lean over the car for a pat-down. Deputy Storts noticed that one of Plaintiff's hands was out of the cuffs. Plaintiff turned his body and Storts attempted to grab the loose hand. (*Id.* at 129). Storts struggled with Plaintiff and tried to get him to the ground to re-cuff him. (*Id.* at 132). At this point, Plaintiff was on his stomach. Deputy Storts had one hand and the other hand was underneath Plaintiff's body. (*Id.*).

Deputy Allen was talking to Norma and heard a scuffle. When Deputy Allen turned around, he saw Plaintiff face down on the driveway[5] with his right arm underneath his stomach. Deputy Storts had about fifty percent of his body weight on Plaintiff and was trying to get Plaintiff's right arm out from under him to cuff it. (*Allen Depo.* at 74). Deputy Allen heard Deputy Storts ask how Plaintiff got out of the handcuffs. (*Id.* at 75). Deputy Allen then grabbed Plaintiff's arm, put it behind Plaintiff's back, and cuffed him. The Deputies then placed Plaintiff

---

[3] According to Deputy Allen, Plaintiff said "Get off my property. You don't belong here. I didn't call you. Norma don't talk to them. Shut up. Mother f*rs get out of here, get out of here." (*Allen Depo.* at 65).

[4] Plaintiff was charged with obstruction of justice and resisting arrest. (Exhibit 1, *Allen Depo.*).

[5] The driveway consisted of gravel. (*Allen Depo.* at 78-79).

3

on his knees. (*Id.* at 76).

According to Deputy Allen, Plaintiff had scratches on his face. A medical squad was called to the scene and determined that Plaintiff had superficial scratches and may have had some gravel in his face. Plaintiff refused medical treatment and he was placed in the cruiser. (*Id.* at 79-81).

Deputy Allen told Ms. Landis about the son's statements regarding firearms and drugs in the home. Norma Landis gave permission for the Deputies to enter the home. (*Allen Depo.* at 58-59). The Deputies went into Plaintiff's bedroom and found two loaded guns under the mattress. (*Id.* at 61). The Deputies rendered the guns safe by taking out the magazines and any bullets that were chambered. (*Id.* at 62). Ms. Landis opened a dresser drawer and the Deputies found a "bunch of hypodermic needles . . . some of them worked, some of them didn't." (*Id.*). In Plaintiff's closet, the Deputies found a loaded SKS[6] and a rifle and shotgun that were not loaded. (*Storts Depo.* at 103).

Plaintiff acknowledged on deposition that the Deputies told him not to come outside of the house as they were talking to Norma. Plaintiff testified that he ignored the order and came outside on the porch and told the Deputies "[f]riends don't let friends drive drunk, dads don't let their sons drive drunk, what did you guys just do . . . ." (*Pl. Depo.* at 60). Plaintiff claims that, at that time Deputy Storts grabbed Plaintiff "in the face" and turned him around to handcuff him. (*Id.* at 63). Plaintiff claims that he was "knocked out." (*Id.* at 65). The next thing Plaintiff remembers is being bent over the cruiser. (*Id.* at 64). According to Plaintiff, he was being choked, was "gasping for air" and "the next thing I know I'm on the ground and I'm

---

[6]The SKS was a semi-automatic carbine rifle.

4

unhandcuffed . . . and I'm getting my face beat into the gravel." (*Id.*). Plaintiff testified that he had no recollection of how he ended up on the gravel drive because he had lost consciousness again. (*Id.* at 67).

Plaintiff's wife testified on deposition that Deputy Storts placed his whole hand on Plaintiff's face and turned him around to place handcuffs on him. (*Norma Landis Depo.* at 73). According to Ms. Landis, Plaintiff was then led to the cruiser. When Deputy Storts noticed that one handcuff was off, he took Plaintiff to the ground and Deputy Allen helped to re-cuff Plaintiff. (*Id.* at 76-77)[7].

A civilian rider who was present with the Deputies on the evening in question testified on deposition that Plaintiff was warned multiple times not to come out of the house as the Deputies were speaking with Plaintiff's wife. (*Shawn Nutter Depo.* at 111-12). Nutter testified that when the Deputies handcuffed Plaintiff on the porch, Plaintiff resisted and yelled and called the Deputies names. (*Id.* at 112). According to Nutter, Plaintiff continued to throw his shoulders around and yell at the Deputies after he was handcuffed. (*Id.* at 115). Nutter testified that a "scuffle" ensued between Plaintiff and Deputy Storts, resulting in Plaintiff lying on the gravel driveway. (*Id.* at 119). Nutter said that Plaintiff's face was never pushed into the driveway. Rather, Plaintiff resisted being handcuffed the entire time he was on the driveway. (*Id.* at 119, 130).

---

[7]Ms. Landis did not observe matters occurring after her husband was taken to the ground. (*Id.* at 77-78).

## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed. R. Civ. P. 56(c); this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but

6

must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

### III.

The Defendants move for summary judgment on the basis that they are entitled to qualified immunity. "Qualified immunity provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to survive a motion for summary judgment raising the defense of qualified immunity, the Plaintiff must show that Defendants violated a constitutionally protected right. The Court considers two sequential questions in this regard: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

7

Plaintiff first challenges whether Defendants had probable cause to arrest him. The Fourth Amendment to the United States Constitution requires probable cause for an arrest. U.S. Const. amend. IV. For the arrest in this case to survive constitutional scrutiny, the Defendants must have had probable cause to believe that Plaintiff committed the offenses of obstructing official business and resisting arrest. In making this determination, the Court must consider whether, "at that moment [of the arrest] the facts and circumstances within [the Defendants'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [Plaintiff] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Based on the facts in the record, the Court concludes that Defendants had probable cause to arrest Plaintiff for obstructing official business and resisting arrest. After Plaintiff's son left the residence, he was yelling and screaming and directing his wife not to talk to the Deputies. While the Deputies were speaking to Plaintiff's wife to determine the veracity of the son's allegation that there were drugs and guns in the house, a state-licensed group home, Plaintiff kept coming out of the house and interrupting the Deputies[8]. The Deputies warned Plaintiff that he would be arrested if the interruptions continued. Plaintiff concedes that he ignored the orders, continued yelling, and came out of the house. (*Pl. Depo.* at 60). In light of these undisputed

---

[8]In addition, as to the offense of resisting arrest, although Plaintiff claims that he had lost consciousness at different points during the arrest, both Defendants testified that Plaintiff had freed one hand from the handcuffs, leading to a scuffle with Plaintiff on the ground. Plaintiff admits that one of his handcuffs came off. A civilian ride-along passenger who was present that evening also testified that Landis would not let the Deputies handcuff him and was "throwing his shoulders around and yelling . . . ." (*Nutter Depo.* at 115). In addition, when Plaintiff first exited the house, he turned his body quickly, causing Deputy Storts to struggle with handcuffing Plaintiff. Deputy Allen assisted in handcuffing Plaintiff on the porch. The record reveals no genuine issue of material fact as to this portion of the case. Based on all of these facts, the Court finds that Defendants had probable cause to believe that Plaintiff committed the offense of resisting arrest.

facts, the Court concludes that the Defendants had probable cause to conclude that Plaintiff had committed the offense of obstructing official business. The Defendants are entitled to qualified immunity on Plaintiff's claim that he was arrested without probable cause.

As to Plaintiff's excessive force claim, it is well-established that individuals have a constitutional right to be free from excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (citations omitted). The right to make an arrest "carries with it the right to use some degree of physical coercion or threat" to effect the arrest. *Id..* The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*, citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). The "reasonableness" inquiry is judged under an objective standard. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* The Court reiterated that "[n]ot every push or shove, even it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal citations omitted).

The Court concludes that genuine issues of material fact exist as to what transpired during Plaintiff's arrest. Plaintiff claims that he was being choked, that he was gasping for air, and that

9

his face was beaten into the gravel driveway[9]. (*Pl. Depo.* at 64). In contrast, Deputy Storts testified that he had difficulty trying to re-cuff Plaintiff's loose hand and ended up in a scuffle on the driveway. According to Deputy Allen, who helped to re-cuff Plaintiff, Deputy Storts used about fifty percent of his body weight on Plaintiff while on the driveway and it took both of them to recuff the Plaintiff. (*Allen Depo.* at 74-76). In short, the testimony reveals two very different versions of the arrest. Such issues must be resolved by a jury. If a jury credits Plaintiff's testimony that he was incapacitated yet choked and beaten into the gravel driveway, the jury could conclude that the Deputies acted unreasonably and violated Plaintiff's Fourth Amendment rights during the arrest on the evening in question. On the other hand, if a jury credits the Defendants' testimony, then Plaintiff's Fourth Amendment claim fails. Since there are genuine issues of material fact regarding the Plaintiff's arrest, the Defendants are not entitled to qualified immunity on Plaintiff's excessive force claim and summary judgment is inappropriate.

The Defendants also move for summary judgment on Plaintiff's claim that his First Amendment right to free speech was violated. Plaintiff claims that he was arrested immediately after criticizing Defendants' order not to come out of the house. According to Plaintiff, his arrest was motivated, at least in part, by his speech. Plaintiff points to no evidence in the record to support this claim. Both Deputies Allen and Storts testified that Plaintiff was arrested because of his interference with their discussion with Plaintiff's wife regarding the allegation that drugs and guns were in the group-home. Plaintiff admitted defying the Defendants' orders to remain in the house while they spoke with his wife. There is nothing in the record to suggest that Plaintiff

---

[9]The Court notes that Plaintiff also claims to have lost consciousness several times during the arrest. While this would appear to undercut Plaintiff's version of events, nonetheless, this remains for a jury to decide.

10

was arrested because of what he said to the officers. In order for Plaintiff's speech to be a "motivating factor" behind the arrest, there must be some evidence that the arrest would not have occurred without the speech. *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002). There is no evidence to support this claim in the case at bar.

Finally, the Court notes that Plaintiff brings several state law claims; specifically, false imprisonment, false arrest, malicious prosecution, abuse of process, assault and battery, intentional infliction of emotional distress and spoliation. The Defendants fail to address the merits of these claims in their motion for summary judgment. Nevertheless, given the resolution of the federal claims, the Court finds that summary judgment on three of Plaintiff's state law claims is warranted.

With respect to the claims for false arrest and false imprisonment, under Ohio law, the two claims are indistinguishable. *Rogers v. Barbera*, 170 Ohio St. 241, 243 (1960). The essence of either claim is that Plaintiff was detained unlawfully. *Tucker v. Kroger Co.*, 133 Ohio App.3d 140, 146 (1999). As stated above, the Court concludes that Plaintiff's arrest was not lacking in probable cause. Thus, the state law claims for false arrest and false imprisonment must fail. Similarly, the state law claim for malicious prosecution is without merit because if probable cause exists, there can be no cause of action for malicious prosecution. *Petty v. Kroger Food and Pharmacy*, 2007 WL 2800378 at *4 (Ohio App. Sept. 27, 2007).

Since the remainder of Plaintiff's state law claims involve legal theories distinct from the federal claims asserted and, since there is no motion for summary judgment on the claims, they remain pending.

11

## IV.

The Defendants' Motion for Summary Judgment (**Doc. #44**) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

10-2-2007
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE